Cite as 2023 Ark. App. 382

# ARKANSAS COURT OF APPEALS

DIVISION II
No.  CR-23-28

|  |  |  |
|---|---|---|
| | | **Opinion Delivered** September 13, 2023 |
| CLEOTIS MILTON | | |
| | APPELLANT | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04CR-20-680] |
| V. | | |
| | | HONORABLE ROBIN GREEN, JUDGE |
| STATE OF ARKANSAS | | |
| | APPELLEE | AFFIRMED |

## STEPHANIE POTTER BARRETT, Judge

Cleotis Milton was convicted by a Benton County Circuit Court jury of the offenses of rape, sexual assault in the first degree, and sexual indecency with a child.  He was ordered to serve consecutive sentences totaling seventy-six years' imprisonment.  Milton argues on appeal that the circuit court erred in denying his motions for directed verdict, asserting that the evidence was insufficient to support the verdicts.  We affirm the convictions.

The victims in this case were daughters of Shameka Holiman, Milton's girlfriend.  In March 2020, a sexual assault involving Milton was reported to the Siloam Springs Police Department; the victim of that assault was MC1, who was sixteen years old at the time.  Siloam Springs Police Department Detective Ron Coble testified that the sexual encounter had been videoed; it showed Milton coming into the room, wrestling with MC1, walking off camera, coming back into view, wrestling a few more minutes, walking off camera again,

coming back into view, unzipping his pants, pulling out his penis and exposing it to MC1, and continuing to try to wrestle with MC1. During this investigation, it was learned that MC2, who was eleven at the time, had disclosed some sexual incidents involving Milton as well.

Milton was arrested. When Detective Coble interviewed him, Milton admitted that he and MC1 had performed oral sex on each other "a few times" in Siloam Springs, and that MC2 had walked in on him on one occasion while he was masturbating, and he had told her to leave. Milton told Detective Coble that Holiman had given him permission to "whoop their butts" and be a disciplinarian for the girls. Milton stated that he had "probably groped" MC1, and while he admitted to having oral sex with MC1 on two or three occasions, he denied having sex with her. Milton claimed that the video was a set up because MC1 wanted him out of the house. Milton stated that MC2 had walked in on him in the Siloam Springs house while he was masturbating, but he denied that he had asked her to do anything with his penis.

MC1, who was seventeen at the time of trial, testified that Milton had lived with her, Holiman, and her eleven siblings in Siloam Springs, but that he had been their neighbor in Jonesboro prior to that, and he had begun dating Holiman in Jonesboro. MC1 said Milton and Holiman had three children together, and sometimes she and her siblings would be at home with Milton while Holiman was not there. MC1 testified that she and Milton had sex in the Siloam Springs house on two occasions; both times Milton had touched her vagina with his hands and his penis; and that she had not wanted to have intercourse with him.

2

She said that she videoed the second encounter because she did not think anyone would believe her. She testified that at the time she made the video, Milton had been staying with them in the Siloam Springs house for several months, but he left after she reported the sexual assault. MC1 said that a neighbor would come and check on the children when neither Holiman nor Milton were home, but she would not come over when Milton was there.

MC2, who was twelve at the time of trial, testified that Milton had moved into the Siloam Springs house a couple of months after they moved from Jonesboro. She said Milton would move out when he and Holiman had an argument, and then move back in later, but when he was living in the house, he kept his clothes there, cooked meals for the kids, and took care of the children when he was the only adult in the house.

MC2 stated that Milton exposed himself to her on at least two occasions, once in Jonesboro and once in Siloam Springs. In Siloam Springs, she had walked into the master bedroom and saw Milton lying on the bed with his penis exposed; he made no effort to cover himself when she walked into the room; and she turned and walked out of the room. MC2 testified that she never wanted to see Milton's penis.

Amber O'Malley, a sexual-assault nurse examiner, testified she examined MC1 at the Child Advocacy Center in Benton County. MC1 had no genital injuries; O'Malley said this was normal, and a lack of injury was not necessarily indicative of a lack of penetration. O'Malley swabbed MC1's genitals; MC1 indicated to her that the alleged abused was her stepfather, and she thought Milton had ejaculated in her vagina. Employees from the Arkansas State Crime Lab testified that semen was found in MC1's underwear and pants,

and DNA testing concluded that Milton could not be excluded as a contributor of that semen.

After the State rested, Milton moved for directed verdicts on all counts. As to sexual indecency with a child, Milton argued that the State failed to present any testimony that he solicited MC2 to engage in sexual intercourse or any sexual act or that he exposed himself to MC2 for any sexual matter; all the testimony showed was that he was naked in his own bedroom and she left the room. As for sexual assault in the first degree, Milton argued that the State had failed to prove that he either had a position as a temporary caretaker or that he was a person in a position of trust or authority over MC1, because he was just an in-and-out boyfriend, and there was another local individual who would come and watch the children at times and be their caretaker. As for the rape allegation, Milton argued that the State failed to prove that he was a caretaker or a guardian or that he engaged in any deviate sexual activity or sexual intercourse with MC1 by force.

The State countered that it had been shown that MC2 was ten or eleven when Milton exposed himself to her; that he was naked and had his penis exposed when she walked into the room; and that he had been masturbating and did not put his penis away when MC2 came into the room. As to sexual abuse in the first degree, the State responded that as to establishing that Milton was a temporary caretaker or in a position of trust or authority over MC1, there was testimony that MC1 referred to Milton as her stepfather, he lived in the house with them for months at a time, and the neighbor did not come by when Milton was at home alone with the children, and Milton watched the kids when Holiman was not at

4

home. As to not being the caretaker or guardian for purposes of the rape allegation, the State responded that the testimony indicated Milton was in charge of the children when Holiman was not at home, watching them, cooking for them, and disciplining them. The State also noted that MC1 had testified that she did not want to have sexual intercourse with Milton. Milton's directed-verdict motions were denied.

Milton testified in his own defense. He said MC1 was just his girlfriend's daughter and his children's sister, and they did not have a relationship. He admitted that he had a physical relationship with MC1, but he said it was not intercourse, it was consensual oral sex, and it had happened twice in Siloam Springs. He denied that he and MC1 had intercourse on the day she made the video; he claimed she fabricated the story to get him out of the house because he was trying to get her to help clean the house and be responsible for her actions.

Holiman testified that she worked almost every day. She said that Milton, who worked the night shift, was sometimes at home with the children when she was at work.

Milton renewed his previous motions for directed verdict, adding that his testimony had rebutted two elements of the rape statute—forcible compulsion and guardianship over the victim. These motions were again denied, and the jury found Milton guilty of all charges.

On appeal, Milton argues the circuit court erred in denying his motions for directed verdict because there was insufficient evidence to support the verdicts. A motion for directed verdict is treated as a challenge to the sufficiency of the evidence. *Curtis v. State*, 2023 Ark. App. 216, 663 S.W.3d 441. In reviewing a sufficiency challenge, we view the evidence in the

5

light most favorable to the State and consider only the evidence that supports the verdict. *Id.* A conviction will be affirmed if substantial evidence exists to support it; substantial evidence is evidence of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way of the other without resorting to speculation or conjecture. *Id.* Circumstantial evidence may provide a basis to support a conviction if it is consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Baker v. State*, 2019 Ark. App. 515, 588 S.W.3d 844. Whether evidence excludes every other hypothesis is left to the jury to decide. *Id.* The credibility of witnesses is an issue for the jury and not the court. *Id.* The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.*

A person commits rape if he or she engages in sexual intercourse or deviate sexual activity with another person by forcible compulsion or, if the victim is a minor and the actor is the victim's guardian. Ark. Code Ann. § 5-14-103(a)(1)&(4)(A)(i) (Supp. 2021). The State alleged both in the criminal information. "Deviate sexual activity" is defined as "any act of sexual gratification involving the penetration, however slight, of the anus or mouth of a person by the penis of another person; or the penetration, however slight, of the labia majora or anus of a person by any body member...." Ark. Code Ann. § 5-14-101(1)(A)&(B) (Supp. 2021). "Sexual intercourse" is defined as "penetration, however slight, of the labia majora by a penis." Ark. Code Ann. § 5-14-101(13). "Guardian" is defined, in pertinent part, as "any person who by virtue of a living arrangement is placed in an apparent position of power or authority over a minor." Ark. Code Ann. § 5-14-101(4).

6

Milton contends there was no testimony presented that he had any authority over MC1 by virtue of a living arrangement; he only lived in the house a few months at a time; and he made no attempt to form a parental bond with the children, support them, discipline them, or assist in their schooling or medical treatment. He describes himself as a "bystander" in MC1's life.

Evidence contrary to Milton's claim was presented at trial, which showed that he was living in the Siloam Springs house in March 2020; he took care of the children when Holiman was not at home by watching them and cooking for them; and, by his own admission to Detective Coble, he had been given permission to discipline the children if needed. This evidence, if believed by the jury, is sufficient to support a finding that Milton exercised an apparent position of power or authority over MC1. The credibility of witnesses and the weight of the evidence are matters for the finder of fact to decide, and this court may not reweigh the evidence or substitute our own credibility determinations for those of the finder of fact. *Baker v. State*, 2022 Ark. App. 391, 654 S.W.3d 63. Because there was sufficient evidence presented to affirm Milton's rape conviction on the basis that he was MC1's guardian and he engaged in sexual intercourse or deviate sexual activity with MC1 while she was a minor, it is unnecessary to address whether the State presented sufficient evidence to support the rape conviction under the forcible-compulsion theory.

Milton next challenges his conviction for sexual assault in the first degree. A person commits sexual assault in the first degree if he or she engages in sexual intercourse or deviate sexual activity with a minor who is not the actor's spouse and the actor is a temporary

7

caretaker or a person in a position of trust or authority over the victim. Ark. Code Ann. §
5-14-124(a)(1)(D) (Supp. 2021). Milton makes the same argument he made with regard to
being MC1's guardian for the purposes of the rape statute—that there was no testimony that
he was in a position of trust or authority over MC1. In *May v. State*, 94 Ark. App. 202, 228
S.W.3d 517 (2006), this court, citing *Bowker v. State*, 363 Ark. 345, 214 S.W.3d 243 (2005),
and *Murphy v. State*, 83 Ark. App. 72, 117 S.W.3d 627 (2003), affirmed a first-degree sexual
assault conviction against the victim's long-time taekwondo instructor for sex acts committed
after class in the studio and on trips to and from tournaments, holding that the statutory
threshold is met where a relationship raises a strong inference of trust and supervision, and
where the appellant's function in the relationship could be characterized at a minimum to
be that of a chaperone. Here, Milton's relationship was much more than that of a
chaperone—he lived with MC1, he took care of the children when Holiman was not home,
and he took on the role of disciplinarian. The jury could certainly conclude Milton was in
a position of trust or authority over MC1.

Milton also challenges his conviction for sexual indecency with a child. A person
commits sexual indecency with a child if, with the purpose to arouse or gratify a sexual desire
of himself or herself or a sexual desire of another person, the person purposely exposes his
or her sex organs to another person who is less than fifteen years of age. Ark. Code Ann. §
5-14-110(a)(2)(A) (Supp. 2021). A person acts "purposely" with respect to his or her conduct
or a result of his or her conduct when it is the person's conscious object to engage in conduct
of that nature or to cause the result. Milton does not challenge that MC2 was less than

8

fifteen years old. Rather, he argues that it was not his conscious object to expose himself to MC2. He contends he had no forewarning that MC2 would enter the bedroom and see his sex organs exposed; he asserts that it was MC2's fault for intruding, without warning, into his private space.

MC2's testimony was that Milton made no effort to cover his genitals after she walked into the room. At that point, the jury could deduce that, because left his penis exposed after MC2 came into the room, he purposely did so for sexual gratification. Witness credibility is an issue for the jury, and the appellate court will not second-guess the determinations of the trier of fact. *Shelton v. State*, 2017 Ark. App. 195, 517 S.W.3d 461.

Affirmed.

GLADWIN and HIXSON, JJ., agree.

*Potts Law Office*, by: *Gary W. Potts*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Michael Zangari*, Ass't Att'y Gen., for appellee.